IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

HCP LAGUNA CREEK CA, LP, HCP          )
DARTMOUTH MA, LP, HCP TOWSON          )
MD, LP, HCP CAMARILLO CA, LP, AND     )
HRA MANAGEMENT CORPORATION,           )
    Plaintiffs-Counter-               )
    Defendants,                       )
                                      )
    and                               )
                                      )
HCP, INC.,                            )
    Counter-Defendant                 )
                                      )
    v.                                )  Case No. 1:09cv824(GBL/TCB)
                                      )
SUNRISE SENIOR LIVING                 )
MANAGEMENT, INC.,                     )
    Defendant-Counterclaimant.        )

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiffs' and Counter-Defendants' Motion for Summary Judgment (Dkt. No. 317) and Defendant-Counterclaimant's Motion for Summary Judgment (Dkt. No. 304). This case concerns the HCP Plaintiffs' allegations that Sunrise Senior Living Management, Inc. ("Sunrise") abused and neglected its management position in connection with the operation of four HCP-owned and HRA-leased senior living facilities. There are nine issues before the Court. The first issue is whether a genuine dispute of material fact exists that Sunrise violated the following provisions of the parties' Management Agreement, as alleged in Counts III-XIII: § 4.02

(Marketing Services); § 4.07 (Purchasing); § 4.09 (Ancillary
Activities); § 6.01 (Accounting and Financial Records); § 6.02
(Reports); § 7.01 (Annual Operating Budget); § 11.02 (Repairs
and Equipment); and Article I (Definitions - Facility Expenses).
The second issue is whether a genuine dispute of material fact
exists that Sunrise violated § 18 (Reports-Accounting
Information) of the Owner Agreement as alleged in Count XII.
The third issue is whether a fiduciary duty exists between the
HCP Plaintiffs and Sunrise such that Sunrise's purported
violations of the Management and Ownership Agreements warrant a
grant of summary judgment in favor of the HCP Plaintiffs as to
Count XIV.  The fourth issue is whether a genuine dispute of
material fact exists that Sunrise realized undisclosed profits
and other income, and made improper expenditures in violation of
the Management and Owner Agreements, as alleged in Count XV.
The fifth issue is whether a genuine dispute of material fact
exists that Sunrise retained funds from ancillary activities or
withheld discounts and rebates on purchasing contracts, in
violation of the Management and Owner Agreements, as alleged in
Count XVI.

The sixth issue is whether the HCP Plaintiffs are entitled
to declaratory relief, as requested in Count I, based on claims
that Sunrise breached the parties' Management and Owner
Agreements.  The seventh issue is whether the HCP Plaintiffs

2

presented sufficient evidence of a likelihood of success on the merits as to claims that Sunrise breached the Management and Ownership Agreements, to justify granting injunctive relief under Count II. The eighth issue is whether a genuine dispute of material fact exists that the HCP Plaintiffs violated the following provisions of the Management Agreements, as alleged in Count I of Sunrise's Counterclaim: § 2.01 (Appointment of Manager); § 7.01 (Annual Operating Budget); and § 10.03 (Tenant's Obligations); and § 11.02 (Repairs and Equipment). The ninth issue is whether a genuine dispute of material fact exists that the HCP Plaintiffs intentionally interfered with HRA's performance under the Management Agreements, to warrant granting summary judgment in favor of Sunrise as to Count III of the Counterclaim. Finally, the tenth issue whether the HCP Plaintiffs thwarted Sunrise's rights and interests under the Management Agreements so as to harm Sunrise's business and reputation, to warrant granting summary judgment in favor of Sunrise as to Counts IV and V of the Counterclaim.

The Court grants summary judgment in favor of Sunrise as to Counts III-XIII because no reasonable trier of fact could find that Sunrise breached any of the Management Agreements' provisions alleged by the HCP Plaintiffs. The Court grants summary judgment in favor of Sunrise as to Count XIV because no genuine dispute of material fact exists as to whether Sunrise

breached the parties' fiduciary duties, as no such duty exists. The Court grants summary judgment in favor of Sunrise as to Counts II, XV and XVI because the HCP Plaintiffs cannot show that they will likely succeed on the merits of their claims. Finally, the Court grants summary judgment in favor of Sunrise as Count I because declaratory relief is improper where Sunrise did not breach the Management Agreements and Ownership Agreements, and was improperly terminated as manager of the Camarillo Facility.

As to Sunrise's Counterclaims, the Court grants summary judgment in favor of the HCP Plaintiffs as to Count I because no reasonable trier of fact could find that the HCP Plaintiffs' alleged violations of the Management Agreements and Ownership Agreements caused actual damage to Sunrise. The Court also grants summary judgment in favor of the HCP Plaintiffs as to Count III because no reasonable trier of fact could find that the HCP Plaintiffs intentionally interfered with HRA's obligations to Sunrise under the Management Agreements. Lastly, the Court grants summary judgment in favor of the HCP Plaintiffs as to Counts IV and V because Sunrise presents insufficient evidence to show that the HCP Plaintiffs willfully and maliciously injured Sunrise's business or reputation.

## A. Parties

In 2003, Sunrise Senior Living Management, Inc.
("Sunrise"), a Virginia incorporated subsidiary of Sunrise
Senior Living, Inc., began managing a collection of senior
living facilities owned by CNL Retirement Properties, Inc.
("CNL").  Over time, Sunrise became the manager of a large
number of CNL-owned facilities, including the MA1 portfolio
properties, which are comprised of four senior living
facilities: Laguna Creek CA, LP; Dartmouth MA, LP; Towson MD,
LP; and Camarillo CA, LP (the "Facilities").  (Def.'s Mem. Supp.
Summ. J. ¶ 1; Am. Countercl. and Third-Party Compl. ¶ 1.)  HCP,
Inc. ("HCP") is a real estate investment trust incorporated in
Maryland that owns various assisted living community properties
throughout the United States, which it leases to HRA Management
Corporation ("HRA"), a Delaware- incorporated company.  (Compl.
¶¶ 10 & 11.)  The relationship between HCP and HRA, therefore,
is one of landlord-tenant.

In 2006, CNL and HCP entered into a merger agreement,
valued at over $5 billion, wherein HCP would acquire CNL assets,
including the Facilities.  (Def.'s Mem. Supp. Summ. J. ¶ 2; Am.
Countercl. and Third-Party Compl. ¶ 14.)  Although HCP became
the owner of the Facilities, it leased them to HRA, who
entrusted the operation and management of the Facilities to

5

Sunrise, pursuant to four identical Management Agreements ("MAs"). (Compl. ¶¶ 13 & 17-21.) While not a party to the MA, HCP nonetheless receives certain rights and benefits that flow from the Facilities' operation, as their owner. (Compl. ¶ 16.) Along with HRA, HCP is also a party to four Owner Agreements ("OAs") with Sunrise that govern the Facilities' operation and revenues. (Compl. ¶¶ 13 & 23.)

## B. HCP's Attempt to Restructure the Management Agreements

Before the CNL-HCP merger, HCP approached Sunrise and proposed to alter Sunrise's contractual relationship with CNL by having Sunrise lease rather than manage the Facilities. (Am. Countercl. and Third-Party Compl. ¶ 15.) Sunrise rejected HCP's proposal, the substance of which would have caused Sunrise to take on the economic risks of ownership beyond simply managing the Facilities. (Am. Countercl. and Third-Party Compl. ¶ 15.) In a move that Sunrise insists was an attempt to pressure it into renegotiating the MAs, HCP retained a forensic auditing firm to inspect Sunrise's books and records just days after the CNL-HCP merger. (Am. Countercl. and Third-Party Compl. ¶ 18.) The audit, however, did not reveal any breach of contractual obligations of other Sunrise-managed facilities. (Am. Countercl. and Third-Party Compl. ¶ 19.)

In February 2007, Sunrise and HCP reached a tentative agreement to restructure the MAs, whereby HCP would buy out a limited number of the MAs and the structure of the remaining MAs would change. (Keyes Decl. Ex. 10; Def.'s Mem. Supp. Summ. J. ¶ 5; Am. Countercl. and Third-Party Compl. ¶ 21.) However, despite months of negotiation, no binding agreement culminated. (Am. Countercl. and Third-Party Compl. ¶¶ 21 & 22.) Thereafter, HCP served Sunrise with notices of default for breach of the MAs and sought another audit of Sunrise's books and records. (Am. Countercl. and Third-Party Compl. ¶ 28.) The parties met in Virginia to discuss the scope of the audit and HCP's proposal to buy out Sunrise's interest in certain properties. (Am. Countercl. and Third-Party Compl. ¶ 29.) After Sunrise sent a letter to HCP refuting allegations of default, the parties signed a non-binding Summary of Terms, and HCP suspended its audit. (Am. Countercl. and Third-Party Compl. ¶¶ 30 & 31.) However, when negotiations over the definitive terms of the Summary of Terms ended in April 2009, HCP recommenced the audit. (Am. Countercl. and Third-Party Compl. ¶ 32.) To date, HCP has not alleged that the audit revealed a breach of contractual obligation by Sunrise.

## C. Alleged Violations of the Management and Owner Agreements

According to HCP, Sunrise has mismanaged and
misappropriated funds that rightfully belong to HCP, given the
CNL-HCP merger. HCP's contention that Sunrise abused and
neglected its management position pertains mainly to allegations
that Sunrise:

     (1)  violated facility health and safety requirements,
           leading to the revocation of the Medicare
           certification for the Camarillo facility;
     (2)  took for itself rebates and so-called
           "administrative fees" and "dividends" ([],
           hidden rebates/kickbacks) as a result of material
           purchased for the facilities;
     (3)  charged HCP for [Sunrise]'s own headquarters'
           costs by allocating those costs to the MA1
           facilities under the guise of "shared services";
     (4)  engaged in self-dealing by purchasing goods and
           services from a[] [Sunrise] affiliate at inflated
           prices and with double-dipping surcharges; and
     (5)  attempted to hide these activities by refusing
           to provide financial performance reports by
           frustrating audits and by misrepresenting its
           practices to HCP.

(Pls.' Mem. Supp. Summ. J. 1-2.)

    1. *Medicare Certification*

In 2007, the Centers for Medicare & Medicaid Services
("CMS") inspected the Camarillo Facility and discovered a number
of deficiencies in the standards and quality of care available
to its residents. (Nickelsburg Decl. Exs. 19-22.)
Consequently, CMS revoked the Facility's Medicare certification.
(Nickelsburg Decl. Exs. 20 & 23.) Despite losing its
certification, however, the Facility still remained licensed by

the State of California and continued its operations. (Keyes
Decl. Exs. 30-37.) In an effort to become re-certified, Sunrise
has since hired a new consultant and Executive Director to
implement and oversee the necessary changes to the Camarillo
Facility. (Keyes Decl. Ex. 29 at 221:5-16, 223:5-224:14, &
225:15-20.)

2. *Retaining Rebates and Administrative Fees*

Sunrise operates a national purchasing program whereby it
purchases supplies on behalf of the facilities it manages.
(Nickelsburg Decl. Ex. 30 at 251:6-12.) Under this program,
Sunrise receives rebates, administrative fees, and dividends
from various vendors. When a rebate is given, Sunrise retains
20% for itself and allocates 80% to the Facilities.
(Nickelsburg Decl. Ex. 33 at 257:2-10.)[1] As to the
administrative fee that Sunrise charges vendors to participate
in the purchasing program, Sunrise retains 100% of the fees.
(Nickelsburg Decl. Ex. 30 at 224:7 & Ex. 34 at 253:7-254:1.)

3. *Allocating Corporate Costs to the Facilities*

HCP alleges that Sunrise improperly allocated the
Facilities' corporate costs that HCP already pays for under the
management fee. These costs include, among other, payroll
processing, which HCP contends are not covered by the MAs and

---

[1] Beginning in 2010, Sunrise agrees to allocate 100% of all rebates it
receives to the Facilities. (Def.'s Opp'n Pls.' Mot. Summ. J. at 5 & 14.)

9

should be absorbed by Sunrise.  (Pls.' Mem. Supp. Summ. J. 7,
18-20.)

4.  *Self-dealing*

According to HCP, Sunrise engaged in self-dealing with one
of its subsidiaries, Martha Child Interiors, Inc. ("MCI"), a
provider of furniture, fixtures and equipment.  (Pls.' Mem.
Supp. Summ. J. 7-8, 20-22.)   Rather than purchase the
Facilities' supplies, including furniture, through a competitive
selection process to ensure the lowest price, Sunrise allegedly
purchased them from MCI for a 12% procurement fee and 10% design
fee, which Sunrise then passed to the Facilities.  (Nickelsburg
Decl. Ex. 45 at 203:4-204:16 & 2187:21-219:12, Exs. 46 & 47 ,
Ex. 48 at 46:12-47:24, Ex. 49 at 73:2-13, Ex. 51 at 68:17-67:2.)

5.  *Financial Reports*

HCP alleges it is entitled in the ordinary course of
business to inspect the Facilities' books and records.  This
right, however, was allegedly obstructed by Sunrise, who refused
to cooperate on a number of occasions when HCP requested
information concerning the rebates Sunrise received.
(Nickelsburg Decl. Ex. 28 & 29.)  Sunrise finally permitted HCP
to inspect the Facilities' books and records after HCP issued a
Notice of Default regarding the Facilities.  (Nickelsburg Decl.
Ex. 69.)  However, the inspection provided limited information
to allow HCP to reach any conclusions with regard to the

10

accuracy of Sunrise's compliance with the MA.

Under the MAs, which cover HRA and Sunrise's rights and duties, Sunrise is responsible for the daily operations of the Facilities and for overseeing their financial affairs. (Compl. ¶ 17.) Each of the MAs are divided into eighteen sections: Definitions (Article I); Appointment of Manager and Primary Goal of Agreement (Article II); Management Fees (Article III); Duties and Rights of Manager (Article IV); Operating Profits, Credits and Collections, and Procedure for Handling Receipts and Operating Capital (Article V); Financial Records (Article VI); Annual Operating Budget (Article VII); Environmental Matters (Article VIII); Other Financial Matters (Article IX); General Covenants and Tenant and Manager Obligations (Article X); Repairs, Maintenance and Replacements (Article XI); Insurance, Damage, Condemnation, Force Majeure (Article XII); Termination of Agreement (Article XIII); Defaults (Article XIV); Legal Actions, Governing Law, Liability of Manager and Indemnity (Article XV); Regulatory and Contractual Requirements (Article XVI); Proprietary Marks, Intellectual Property (Article XVII); and Miscellaneous Provisions (Article XVIII). (Mgmt. Agmt. i-iii.) Like the MA, the OA's material terms are nearly identical between the Facilities. (Compl. ¶ 24.) Divided into twenty-two sections, the OA outlines, among other things, HCP's rights and obligations as landlord to HRA and as owner of the Facilities.

11

## D. Procedural History

The parties' dispute culminated in HCP and its Facilities, along with HRA (the "HCP Plaintiffs"), filing suit in the Delaware Court of Chancery alleging, among other things, that Sunrise breached various provisions of the MA. (Am. Countercl. and Third-Party Compl. ¶ 33.) The HCP Plaintiffs then filed suit in this Court alleging the following sixteen Counts in their Complaint: I (declaratory judgment); II (injunctive relief); III (breach of contract - budget approval process); IV (breach of contract - ancillary activities); V (breach of contract - repairs and maintenance expenditures); VI (breach of contract - payroll outsourcing costs); VII (breach of contract - accounting systems and reporting software); VIII (breach of contract - purchasing); IX (breach of contract - facility expenses); X (breach of contract - dues); XI (breach of contract - licenses); XII (breach of contract - marketing services); XIII (breach of contract - financial reporting); XIV (breach of fiduciary duties); XV (equitable accounting); and XVI (constructive trust). (Compl. ¶¶ 122-204.)

In response, Sunrise filed a Counterclaim and Third-Party Complaint against the HCP Plaintiffs, alleging the following five Counts: I (breach of contract); II (breach of implied

12

covenant of good faith and fair dealing);[2] III (tortious interference with contractual relations); VI (common law conspiracy to harm business and reputation); and V (conspiracy to harm business and reputation under Virginia Code § 18.2-499 - 500). (Am. Countercl. and Third-Party Compl. ¶¶ 50-74.)

According to Sunrise, its refusal to agree to a restructuring plan led to retaliatory acts by HCP and HRA. Specifically, Sunrise insists that HCP and HRA obstructed Sunrise's ability to manage the Portfolio Facilities by refusing to approve or disapprove proposed budgets for the 2007, 2008 and 2009 cycles, and by refusing to negotiate in good faith over the terms of the proposed budgets, as required under the MA and OA. (Am. Countercl. and Third-Party Compl. ¶ 34.) This refusal to approve or disapprove the proposed budgets has allegedly caused the Facilities to suffer due to insufficient funds. (Am. Countercl. and Third-Party Compl. ¶ 43.)

Before the Court now are Cross-Motions for Summary Judgment by the HCP Plaintiffs and Sunrise.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that

---

[2] The Court dismissed Count II of Sunrise's Counterclaim and Third-Party Complaint on November 6, 2009. (Dkt. No. 45.)

there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis added).

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor.

14

*Anderson*, 477 U.S. at 248. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. ANALYSIS

### A. HCP Plaintiffs' Claims

#### i. Counts III-XIII

The Court grants summary judgment in favor of Sunrise as to Counts III-XIII because no reasonable trier of fact could find that Sunrise breached any of the MA provisions alleged by the HCP Plaintiffs. In order to recover for a breach of contract claim, a plaintiff must allege: (1) existence of a contract; (2) performance or offers by plaintiff to perform under the contract; (3) defendant failed to perform under the contract or breached the agreement; and (4) the breach caused actual damage to plaintiff. *Filak v. George,* 594 S.E.2d 610, 614 (Va. 2004). The principles governing contract interpretation are well-established: "when the terms of a contract are clear and unambiguous, a court must give them their plain meaning." *Pocahontas Mining Ltd. Liability Co. v. Jewell Ridge Coal Corp.*, 556 S.E.2d 769, 771 (Va. 2002) (citations omitted). Courts must

look to "the intention of the parties as expressed by them in the words they have used, and [] are bound to say that the parties intended what the written instrument plainly declares." *Meade v. Wallen*, 311 S.E.2d 103, 104 (Va. 1984). At dispute is whether Sunrise failed to perform under certain provisions of the MA.

### a. § 7.01 (Annual Operating Budget)

Section 7.01 of the MA states, in relevant part: [Sunrise] shall . . . deliver to [HRA] for [HRA's] approval, a draft operations budget for the next year for the Facilit[ies], and a final operations budget . . . . The budget as proposed, shall be considered by [HRA] and, in consultation between [HRA] and [Sunrise], the budget for the Facilit[ies] for the ensuing fiscal year will be prepared by [Sunrise] with the final contents of the budget to be determined mutually by [Sunrise] and [HRA] (the "Annual Operating Budget"). If there is a delay in the finalization of a new Annual Operating Budget, or if [HRA] shall fail to approve the newly proposed budget, [Sunrise] shall operate under the expired Annual Operating Budget, increased by the greater of (i) 3 ½% or (ii) the increase in the Index from the first day of the new year compared to the Index on the first day of the previous year, until a new budget is approved. If consensus cannot be reached between the parties as to the Annual Operating Budget within sixty (60) days of [HRA's] receipt of the proposed budget, [Sunrise] and [HRA] shall submit the proposed budget to an [e]xpert pursuant to Paragraph 18.8 below for a determination as to any items contained in the Budget which remain in dispute.

(Mgmt. Agmt. § 7.01.) Thus, § 7.01 sets forth a three-step process that Sunrise must comply with after it proposes an operating budget. Moreover, where the MA "calls for a matter to

16

be referred to arbitration or an Expert . . . [u]nless specifically stated to the contrary, the use of the Expert shall be the exclusive remedy . . . ." (Mgmt. Agmt. § 18.18(a).) As such, expert resolution is HRA's, and hence, the HCP Plaintiffs' exclusive remedy for any dispute about a proposed operating budget.

The HCP Plaintiffs contend that Sunrise's proposed budgets for 2007, 2008, and 2009 lacked the requisite details required by the MA, which prevented them from proper consideration and approval. Specifically, Sunrise allegedly increased expenses or attempted to pass through certain expenses to the Facilities. (Compl. ¶ 138.) In regard to the 2007 budget, the HCP Plaintiffs did not respond to approve or disapprove it (Keyes Decl. Ex. 17, Ex. 50 at 61:17-62:22; Dorrien Decl. ¶ 4); and in contravention of § 7.01, the budget was not submitted to an expert, despite the parties' inability to agree on it. Although the HCP Plaintiffs disapproved of the 2009 proposed budget in its entirety, again, they did not comply with the requirement of § 7.01. In both instances, the disputed proposed budgets were not submitted to an expert for review. (Pls.' Opp'n Def.'s Mot. Summ. J. 4.) Because submission to an expert is the HCP Plaintiffs' sole remedy for any dispute about a proposed budget, Sunrise cannot be said to have breached § 7.01 of the MAs.

17

b. § *4.09 (Ancillary Activities)*

Section 4.09 provides in pertinent part:

> [Sunrise] and/or its Affiliates, shall have the right,
> with [HRA's] prior written approval or as part of
> the Approved Budget, to utilize the Facilit[ies] for
> ancillary activities, the revenues from which will
> not be included in Gross Revenues . . . .

(Mgmt. Agmt. § 4.09.) According to the HCP Plaintiffs, Sunrise
is a party to side-agreements with some ancillary service
providers, through which Sunrise received revenues that are not
included in the Facilities' gross revenues.  These ancillary
service providers allegedly utilized the Facilities' space,
equipment, supplies and utilities.  (Compl. ¶¶ 143 & 144.)
However, as stated, § 4.09 is implicated only if "Sunrise and/or
its Affiliates" provide ancillary services, not when *third
parties* provide ancillary services.  (Mgmt. Agmt. § 4.09.)

Here, any ancillary healthcare services provided at the
Facilities have been provided by third parties, rather than
Sunrise or an affiliate.  (Keyes Decl. Ex. 51 at 90:3-91:1 &
222:4-11.)  The HCP Plaintiffs provide no evidence suggesting
that Sunrise inappropriately retained ancillary services revenue
(Keyes Decl. Ex. 52 at 205:21-206:19, Ex. 53 at 115:1-22) or
that third party ancillary service providers failed to reimburse
the Facilities for expenses incurred in the provision of such
services (Keyes Decl. Ex. 52 at 213:22-214:6).  Additionally,
there is no evidence the HCP Plaintiffs suffered damages

resulting from the alleged loss of equipment, supplies, and
utilities consumed by the alleged ancillary services claimed in
Count IV. (Keyes Decl. Ex. 25 at 6.) Damage cannot be shown by
simply stating that the Facilities have been damaged in the
amount of rent not collected from third parties. (Pls.' Opp'n
Def.'s Mot. Summ. J. 14.) Thus, Sunrise committed no breach of
§ 4.09 where neither Sunrise nor its affiliates provided any
ancillary services at the Facilities, and the HCP Plaintiffs
cannot identify damages from the so-called ancillary services.
(Keyes Decl. Ex. 52 at 205:21-206:4, Ex. 53 at 115:1-22.)

        c. § 11.02 (Repairs and Maintenance Expenditures)

        Under § 11.02, the HCP Plaintiffs must create a furniture,
fixture and equipment reserve account (the "FF&E Reserve") at a
bank to cover the cost of repairs and equipment for maintaining
the Facilities. Sunrise is obligated to fund the FF&E Reserve
for each Facility, pursuant to a specific formula. (Mgmt. Agmt.
§§ 11.02(a), (b) & (e).) To do so:

    [Sunrise] shall prepare an estimate (the "Repairs
    and Equipment Estimate") of the expenditures necessary
    for . . . the ensuing Fiscal Year and shall submit
    such Repairs and Equipment Estimate to [HRA] at the
    same time it submits the Annual Operating Budget . .
    . . [Sunrise] will endeavor to follow the applicable
    Repairs and Equipment Estimate, but shall be entitled
    to depart therefrom, in its reasonable discretion,
    provided that: (A) such departures . . . result from
    circumstances which could not reasonably have been
    foreseen at the time of the submission . . . . and
    (B) such departures . . . result from circumstances

19

which require prompt repair and/or replacement to
comply with Legal Requirements; and (C) [Sunrise]
has submitted to [HRA] a revised Repairs and Equipment
Estimate setting forth and explaining such departures.

(Mgmt. Agmt. § 11.02(d).)  When read in light of § 11.02(c)'s

reference to "total aggregate amount," § 11.02(d)'s furniture,

fixtures and equipment (FF&E) spending limit is an aggregate

one.  (Mgmt. Agmt. § 11.02(c).)  It necessarily limits instances

where expenditures depart from the estimate as a whole.

The HCP Plaintiffs' allegations that Sunrise violated §

11.02 are based on (1) Sunrise's substitution of two items on

the Repairs and Equipment Estimate—patio furniture and a carpet

extractor—and (2) Sunrise's use of its design division, Martha

Child's Interiors ("MCI"), to purchase FF&E for the Facilities.

(Def.'s Reply Supp. Summ. J. 5.)  With regard to the patio

furniture and carpet extractor, there is no provision in the MA

granting the HCP Plaintiffs any approval rights with respect to

the Repairs and Equipment Estimate presented by Sunrise, so long

as there are sufficient funds in the FF&E Reserve.  On these

facts, Sunrise made the furniture and equipment substitutions

for the safe and sound operation of the Facilities.  The patio

furniture had become wobbly and unsafe for residents (Keyes

Decl. Ex. 110, Ex. 113 at 219:1-13), and the carpet extractor is

necessary to maintain the Facilities in proper condition (Keyes

Decl. Ex. 114 at 205:21-206:8, Ex. 115 at 203:7-11).  These

substitutions amount to a variation within, rather than above, the Repairs and Equipment Estimate, and therefore comport with the language of § 11.02(c) and do not require the HCP Plaintiffs' prior approval.  These substitutions are also supported by § 11.02(d)'s requirement that Sunrise make the necessary expenditures to operate the Facilities in first class condition.  Furthermore, even if the substitutions were unapproved, there is no evidence that the HCP Plaintiffs suffered damage from the repair and maintenance of the Facilities.

As to the MCI services, the HCP Plaintiffs first allege that Sunrise paid inflated prices and surcharges to MCI, which charged a 12% procurement fee from October 2006 to date, a 10% design fee, and other installation fees.  (Jeannault Decl. ¶¶ 6 & 7; Nickelsburg Decl. Ex. 45 at 203:4-205:9, Ex. 51 at 68:20-69:1.)  These allegations are contradicted by HCP's written agreement "that [MCI] should get a procurement fee and 12% seems reasonable."  (Keyes Decl. Ex. 28; Def.'s Mem. Supp. Summ. J. 6.)  Second, the HCP Plaintiffs allege that Sunrise breached its obligations to procure goods at a fair market value, after a competitive selection process.  (Pls.' Mem. Supp. Summ. J. 21.) These allegations are unavailing for three reasons:  (1) the MA contains no "comparison shop" or "competitive bid" requirement" for purchases from third parties—it merely requires that

expenditures for FF&E be reasonable and necessary to maintain a

first class Facility; (2) HCP website print-outs, without

evidentiary support to show that MCI's prices are not

competitive, are hearsay documents; and (3) the HCP Plaintiffs

offer no evidence that Sunrise did not act in the Facilities'

best interest when it purchased MCI's goods.  (Def.'s Opp'n

Pls.' Mot. Summ. J. 21.)  Thus, the HCP Plaintiffs' fail to show

that Sunrise exceeded the reasonable discretion provided to it

pursuant to § 11.02, and there is insufficient evidence for a

reasonable juror to find that Sunrise breached § 11.02 of the

MAs.

    d.   § 6.01 (Payroll and Systems Accounting)

    Section 6.01 provides, in relevant part:

    [Sunrise] shall, at its own expense, establish and
    administer accounting procedures and controls and
    systems for the development, preparation and
    safekeeping of records and books of accounting
    relating to the business and financial affairs of the
    Facilit[ies], including payroll, accounts receivable
    and accounts payable . . . .

(Mgmt. Agmt. § 6.01.)  However, Sunrise is not responsible for

any expense that fall under the MAs' list of "Facility

Expenses, which include:

    [C]osts and expenses directly related to the operating
    costs and staffing of the Facilit[ies], . . . including,
    without limitation . . .

    Costs incurred by [Sunrise] for all personnel employed
    at the Facilit[ies] . . . , such costs to include

22

salary and wages, training programs, hiring expenses,
payroll taxes, workers' compensation, bonus
compensation, incentive compensation, retirement plan
payments, travel expenses and other benefits payable
(including, for example, health insurance, dental
insurance, life insurance and disability insurance)
to such personnel . . .

Costs incurred by [Sunrise] for electronic data
processing equipment, systems software or services
used at the Facilit[ies] . . . .

(Mgmt. Agmt. 3 & 5.)

The HCP Plaintiffs allege that Sunrise: (1) charged the
Facilities for unapproved payroll expenses since 2007 and
continues to do so; (2) charged unapproved accounting reporting
and systems software for its corporate-level expenses; and (3)
failed to prepare monthly, quarterly and annual financial
reports in accordance with the MAs. (Compl. ¶¶ 72, 154, 157,
158 & 177.) The unapproved payroll expenses allegations concern
the amount of money paid to Automated Data Processing ("ADP")
for the payroll processing costs for the Facilities' employees
and how Sunrise allocates those costs. (Pls.' Mem. Supp. Summ.
J. 18-20.) ADP's services include: (1) processing labor hours
recorded by facility-level employees in Sunrise's time and
attendance system to calculate employee paychecks; (2)
calculating paychecks issued to facility-level employees and the
associated withholdings (e.g., taxes, benefits, garnishments,
etc.); (3) generating and distributing paychecks and pay
statements to employees; (4) providing payroll-related help-desk

service to facility-level employees; (5) inputting employee personal information received from Sunrise's facility-level employees into the ADP processing platform; and (6) issuing Form W-2s to facility-level employees. (Roder Decl. ¶ 4, Mar. 30, 2010.) Sunrise allocates the costs for these services to each Facility. (Roder Decl. ¶ 4, Mar. 30, 2010.) Sunrise does not, however, allocate to the Facilities the costs of maintaining Peoplesoft, a general ledger system for the Facilities' books and records, which Sunrise uses to generate the Facilities' financial reports. (Roder Dec. ¶ 3, Mar. 30, 2010.)

Under the plain language of § 6.01, which governs Sunrise's responsibility in establishing and administering accounting procedures for the development and reporting of records and accounting books relating to the Facilities, Sunrise is not required to bear the payroll processing costs for the Facilities. (Mgmt. Agmt. § 6.01.) Sunrise is simply required to create and maintain payroll books and records at its own expense, which it has successfully done by bearing the costs of implementing and administering the PeopleSoft accounting system and generating relevant financial reports related to the Facilities. (Def.'s Mem. Supp. Summ. J. 7.) To do so, Sunrise simply centralized the accounts payable processing function to achieve efficiency in processing and in paying invoices received by all the facilities it manages. (Roder Decl. ¶ 3, Apr. 16,

24

2010.)  In addition, Sunrise bears the full costs of the payroll
accounting team, which is responsible for recording general
ledger entries related to payroll activity and for reconciling
payroll-related accounts. (Roder Dec. ¶¶ 3 & 6, Apr. 16, 2010.)
Because Sunrise was not obligated to perform payroll processing
duties at its own expense, Sunrise did not breach the MAs by
hiring and compensating ADP for its payroll processing services.

As to allegations of unapproved accounting reporting and
systems software, the HCP Plaintiffs insist that Sunrise
improperly charged the Facilities for the "AOD billings systems,
IT costs, desktop licensing software, time and attendance and
other systems and software, and reporting expenses" in the
amount of $15,736. (Compl. ¶ 75; Def.'s Mem. Supp. Summ. J. 8.)
Sunrise also allegedly charged the Facilities for other expenses
including: (1) accounts payable processing; (2) registrar's
office; (3) telecommunications services; (4) resident billing
support; and (5) resident bill print and delivery. (Pls.' Mem.
Supp. Summ. J. 18-20.)  These charges, according to the HCP
Plaintiffs, resulted in damages exceeding $260,000. (Pls.' Mem.
Supp. Summ. J. 20.)  However, the HCP Plaintiffs, not Sunrise,
are in fact responsible for the payroll processing costs *and* the
cost of any accounting reporting systems software. The MAs'
definition of Facility Expenses expressly includes costs for
"electronic data processing," systems, and services . . . ."

(Mgmt. Agmt. 5.)  The AOD Billing System, time and attendance and desktop software licensing, and IT costs constitute electronic data processing and systems software.  These costs are directly associated with managing the Facilities' timekeeping and attendance system.  As such, they were appropriately billed as Facility Expenses.

The HCP Plaintiffs allege that "Sunrise failed to prepare monthly, quarterly, and annual financial reports in accordance with the requirements of Exhibit E of the [MAs] and to provide such reports [to] Plaintiffs."  (Compl. ¶ 177.)  Exhibit E requires, among other things, that Sunrise provide capital expenditure reports, rent roll, and variance reports regarding the Facilities' finances, operations, leasing and marketing. (Mgmt. Agmt. Ex. E.)  Exhibit E lists no requirement that Sunrise prepare monthly, quarterly or annual reports.  Contrary to the allegations, Sunrise provided the HCP Plaintiffs all of the required financial reports.  Sunrise fully complied with all requests for reports before and after the CNL-HCP merger. (Keyes Decl. Ex. 61 at 78:8-21, Ex. 62 at 29:7-19, 33:11-20.)  Even HCP's CEO publicly praised the quality of Sunrise's reporting, telling investors that "the quality and the timeliness of the property level accounting information we get from Sunrise are as good as anybody else in our senior housing portfolio."  (Keyes Decl. Ex. 43 at 14.)  Furthermore, despite their claims of

26

damages, it is unclear what harm the HCP Plaintiffs suffered

other than their inability to monitor capital expenditures and

the Facilities' performance. (Keyes Decl. Ex. 5 at 312:2-

313:6.)   Therefore, no reasonable trier of fact could find that

Sunrise breached the MAs by charging the Facilities for

unapproved payroll expenses and accounting reporting and system

software, and neglecting to prepare the required financial

reports.

   e.   § 4.07 (Purchasing)

   Section 4.07 states, in pertinent part:

   [Sunrise] shall use, on behalf of the Facilit[ies],
   such purchasing systems and procedures developed by
   or otherwise available. . . .  Any purchase by
   [Sunrise] made pursuant to or otherwise ancillary to
   this Agreement shall be made with [Sunrise] acting
   for and at the expense of the Facilit[ies] or [HRA]
   . . . . [Sunrise] shall fully disclose to [HRA] any
   material interest of [Sunrise] and/or Affiliate in
   any vendor and [Sunrise] shall establish to [HRA's]
   reasonable satisfaction that the purchase or contract
   was made after a competitive selection process and
   at a fair market price.  In the event that [Sunrise]
   receives any competitive discounts and/or rebates due
   to its relationships with vendors, [Sunrise] covenants
   to allocate the fair and reasonable portion of any
   such discounts and/or rebates to the Facilit[ies]
   in order to reduce Facility Expenses.

(Mgmt. Agmt. § 4.07.)   The HCP Plaintiffs allege that Sunrise

improperly retained 20% of the rebates received from vendors to

offset the cost of administering the purchasing department.

(Pls.' Mem. Supp. Summ. J. 6-7; Compl. ¶ 161.)   However, §

27

4.07's "fair and reasonable portion" language does not require
Sunrise to allocate 100% of the rebates or the amount remaining
after Sunrise's cost of generating the rebates are covered.
(Mgmt. Agmt. § 4.07.)  Indeed, 20% would not be unfair and
unreasonable where the HCP Plaintiffs fail to indicate
otherwise.  If the HCP Plaintiffs wanted Sunrise to turn over
100% of all discounts and rebates to the Facilities, the proper
language to use in the MAs would not be a "fair and reasonable
portion," which necessarily means a part of the whole, but
"all."  (Mgmt. Agmt. § 4.07.)  In interpreting the MAs' plain
meaning, the Court cannot read § 4.07 to require that Sunrise
disclose any more than a "portion" of any discounts or rebates
obtained.

        Additionally, evidence shows that Sunrise was candid with
HCP, when asked, regarding its savings and its method of
accounting for the rebates.  (Krummel Decl. ¶ 11.)  During a
meeting with HCP's Vice-President of Asset Management, Sunrise's
representative answered questions about how Sunrise receives
rebates and administrative fees.  (Krummel Decl. ¶¶ 11-13.)
The mere fact that Sunrise secured more than $6,000 in surplus
in 2008 for the management of approximately 400 facilities is
insubstantial evidence that it improperly withheld money from
the HCP Plaintiffs.

Moreover, the retention of a portion of the discounts or rebates is consistent with language providing that purchases "shall be made with [Sunrise] acting for and at the expense of the Facilit[ies] or [HRA]." (Mgmt. Agmt. § 4.07.) Thus, the HCP Plaintiffs have not shown that Sunrise acted contrary to an express application of § 4.07 as written.

### f. *Facility Expenses*

As discussed, travel costs are allocated to the Facilities under the definition of Facility Expenses, which includes:

> Costs incurred by [Sunrise] for all personnel employed at the Facilit[ies] . . . or the regional business manager or such additional personnel employed in part at the Facilit[ies] and in part at other facilities not owned by Tenant, a reasonable share of costs of such personnel . . . , such costs to include . . . travel expenses . . . .

(Mgmt. Agmt. 5.) Additionally, Exhibit B of the MA lists "quality assurance" as an expense to be allocated to the Facilities. (Mgmt. Agmt. Ex. B.)

The HCP Plaintiffs argue that Sunrise improperly charged the Facilities for two corporate-level travel expenses related to two Quality Services Review ("QSR") programs: (1) Quality Services Review and (2) Quality Services Review for Skilled Nursing. (Compl. ¶ 164.) Both programs are run by Sunrise to ensure that each Facility meets its national standards for resident care. (Keyes Decl. Ex. 58 at 84:2-85:5.) HCP also

seeks damages for charges incurred by Sunrise's corporate employees to attend retreats held at resorts. (Pls.' Mem. Opp'n Def.'s Mot. Summ. J. 21.)  The HCP Plaintiffs further allege that Sunrise charged the Facilities for Sunrise's and its employees' dues and due-like subscriptions to the Assisted Living Federation of America.  (Compl. ¶ 167.)

However, there is no evidence that the two QSR programs are unnecessary to the proper maintenance of the Facilities or that the travel expenses for those programs were billed to the Facilities.  As to the Assisted Living Federation of America memberships, they are maintained in the name of individual Sunrise communities.  The Facilities hold the membership, not Sunrise.  As manager of the Facilities, Sunrise is permitted, under the MA, to operate and maintain the Facilities as it sees fit.  Because these dues are "costs and expenses directly related to the operating costs" of the Facilit[ies], they were properly charged as Facility Expenses.  (Mgmt. Agmt. at 3.) Consequently, the HCP Plaintiffs fail to show that a genuine issue exists for trial regarding Sunrise's alleged violation of the MA's Facility Expenses provision.

g.  § *12.06 (Licensure Issues)*

Section 12.06(a) requires Sunrise and HRA to "use all commercially reasonable efforts . . . during the period of one hundred twenty (120) days" to reinstate a withdrawn or revoked license that is material to the Facilities' operation. (Mgmt. Agmt. § 12.06)(a).) Medicare is a federal reimbursement program. Medicare certification is not a license or permit; rather, it creates an entitlement to certain reimbursements. (Keyes Decl. Ex. 79 at 12-13.) Thus, Medicare certification is not a license to operate an assisted living facility. (Def.'s Mem. Supp. Summ. J. 10-11.) Under the applicable statute, proper licensing is a predicate to certification. *See* 42 U.S.C. § 1395i-3(d)(2)(A) ("A skilled nursing facility must be licensed under applicable State and local law.")

The HCP Plaintiffs allege that Sunrise improperly caused the loss of the Camarillo Facility's Medicare certification in 2008, in violation of § 12.06. (Pls.' Mem. Supp. Summ. J. 9-13.) However, nothing in the MA requires Sunrise to obtain or maintain Medicare certification at the Camarillo Facility. Even after losing its certification in 2008, the Camarillo Facility continued to operate and maintained its license, thereby allowing it to operate and maintain a skilled nursing facility. (Keyes Decl. Exs. 30-37.) In fact, during its first three years of operation, the Facility was without Medicare certification and received no complaints from HCP. (Keyes Decl. Ex. 60 at

31

161:2-11.) As HCP's former Vice President of Asset Management confirmed, Medicare certification is "an option. It can be a good marketing tool . . . ," but is not a requirement or license. (Keyes Decl. Ex. 60 at 25-162:1.)

Furthermore, when Sunrise lost the certification, HCP failed to act for eight months. (Keyes Decl. Ex. 100 at 32:12-16.) When HCP finally complained by sending a letter to Sunrise, it is unclear that HCP equated the loss to Sunrise's breach of the standard of care under the MAs. (Nickelsburg Decl. Ex. 23.) While the remedy sought by the HCP Plaintiffs for the Camarillo Facility's loss of Medicare certification was the termination of the Camarillo Facility's MA, nowhere in the record do the HCP Plaintiffs identify the actual damages they suffered. (Compl. ¶¶ 132, 135(v), Relief Requested (pp. 53-54) ¶¶ (b), (d).) Because certification is not a requirement under the MA and there is no precise showing of damages, the HCP Plaintiffs cannot prevail under their breach of contract claim as to § 12.06.

h. *§ 4.02 (Marketing Services)*

Section 4.02 of the MA states that Sunrise shall:

(a) Prepare marketing plan and marketing strategy for the Facilit[ies], and a budget (the "Marketing Budget") for such plan and strategy. The Marketing Budget shall be revised annually at the time of the submission of the Annual Operating Budget.
(b) Direct the marketing efforts for the Facilit[ies]

      (c) Plan and implement community outreach, public
      relations and special events programs.

(Mgmt. Agmt. § 4.02.) The HCP Plaintiffs argue that Sunrise is

required to *provide* HRA with a marketing plan, a marketing

strategy, and a marketing budget on an annual basis. (Compl. ¶¶

91 & 174.) The express language of § 4.02, however, requires

Sunrise to *prepare*, not *provide,* them. (Mgmt. Agmt. § 4.02.)

There is no dispute that Sunrise *prepared* marketing plans,

strategies, and proposed budgets for 2007, 2008, and 2009.

(Keyes Decl. Ex. 38, Ex. 51 at 119:9-120:10 & 122:1-127:6.) The

marketing budgets identified by category the marketing

techniques that Sunrise planned to employ at each Facility and

the resources Sunrise expected to devote to each technique.

(Keyes Decl. Ex. 51 at 122:1-127:6.) Although not required,

Sunrise also included in its annual marketing budgets, weekly

flash reports, monthly focus reports, and competitive business

reviews. (Keyes Decl. Exs. 39-41.) Thus, any argument that

Sunrise failed to *provide* an annual marketing plan, strategy,

and budget, are unfounded. Like their other breach of contract

claims, the HCP Plaintiffs failed to identify any damages

resulting from Sunrise's alleged violation of § 4.02. For these

reasons, no reasonable trier of fact could find that Sunrise's

alleged violations of various provisions in the MAs amount to a

breach of contract.

### ii. Count XIV (Breach of Fiduciary Duties)

The Court holds that no genuine dispute of material fact exists as to whether Sunrise breached the parties' fiduciary duties because no such duties exist as to Sunrise. A fiduciary relationship exists where a party vests the other party with significant discretion in the management of affairs on its behalf. *Oden v. Salch*, 379 S.E.2d 346, 351 (Va. 1989). This is unlike an agency relationship, where the principal controls the manner in which the agent undertakes its duties. *Murphy v. Holiday Inn, Inc.*, 219 S.E.2d 874, 876 (Va. 1975)(stating that the existence of agency relationship depends on whether the agreement gave the alleged principal "control or [the] right to control the methods or details of doing the work." (quoting *Wells v. Whitaker*, 151 S.E.2d 422, 429 (Va. 1966)); *Allen v. Lindstrom*, 379 S.E.2d 450, 454 (Va. 1989). A party may bring a claim for breach of fiduciary duty only where the duty breached is a common law duty and "not one existing between the parties solely by virtue of the contract." *Augusta Mut. Ins. Co. v. Mason*, 645 S.E.2d 290, 293, 295 (Va. 2007) (citations omitted) ("Any fiduciary duty allegedly breached in this case existed solely because of the contractual relationship between Augusta Mutual and Lee-Curtis, and in turn, its employee, Jones. Therefore, we hold that Augusta Mutual failed to assert a valid

claim for breach of fiduciary duties."). Where there is a

"typical business relationship" without evidence that the

parties "intended to create a fiduciary relationship," the court

may not create one. *Vicente v. Obenauer*, 736 F. Supp. 679, 695

(E.D. Va. 1990).

Section 18.14 of the MAs states:

The relationship between [HRA] and [Sunrise] . . .
shall not be one of general agency, but shall be that
of [HRA] with an independent contractor; provided however,
that with respect to those specific and
limited circumstances in which (a) [Sunrise] is holding
funds for the account of [HRA] or (b) [Sunrise] is required
to act as authorized representative for
[HRA] with respect to agreements with residents
pursuant to licenses or Legal Requirements, the
relationship of [Sunrise] to [HRA] shall be that of
authorized representative (with limited agency).
Neither this Agreement nor any agreements,
instruments, documents or transactions contemplated
hereby shall in any respect be interpreted, deemed or
construed as making [HRA] a partner or joint venturer
with [Sunrise] or as creating any similar relationship
or entity, and each party agrees that it will not make
any contrary assertion, contention, claim or
counterclaim in any action, suit or other legal
proceeding involving the other.

(Mgmt. Agmt. § 18.14.) The MAs makes no reference to a

fiduciary duty. It expressly limits Sunrise's relationship to

the HCP Plaintiffs as one of an independent contractor and not

one of agency. Any genuine dispute of material fact that

Sunrise owed a fiduciary duty to the HCP Plaintiffs must arise

from the contractual relationship between the parties. *See*

*Guaranty Sav. & Loan Ass'n v. Ultimate Sav. Bank*, 737 F. Supp.

35

366, 371 (W.D. Va. 1990) (explaining that Service Agreement provided that party would service the loan as an "independent contractor" and contained no reference to a fiduciary relationship and thus no fiduciary duty existed). As the Court must look to the intention of the parties as expressed in the MAs, there can be no finding of a fiduciary duty and the HCP Plaintiffs, therefore, fail to assert a valid claim for breach of fiduciary duties.

### iii. Counts II, XV & XVI (Injunctive Relief

The Court grants summary judgment in favor of Sunrise as to Counts II, XV and XVI because the HCP Plaintiffs cannot show that they will likely to succeed on the merits of their claims. A plaintiff seeking a preliminary injunction must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009) (citing *Winter v. Natural Res. Def. Counsel, Inc.*, 129 S.Ct. 365, 374 (2008)).

In Count II, the HCP Plaintiffs request that the Court issue an injunction to: (1) prevent Sunrise from making further unauthorized withdrawals and expenditures from the Portfolio

Facilities' accounts; (2) require Sunrise to vacate the
Portfolio Facilities; (3) require Sunrise to transfer the
Portfolio Facilities pursuant to §§ 10.01 and 13.02 of the MA;
(4) require Sunrise to grant HCP access to the Portfolio
Facilities' account books and records; (5) require Sunrise to
vacate the Camarillo Facility; and (6) require Sunrise to
transfer the Camarillo Facility pursuant to §§ 10.01 and 13.02
of the MA. (Compl. ¶ 135.) In Count XV, the HCP Plaintiffs
allege that Sunrise (1) realized undisclosed profits and other
income and (2) made improper expenditures from the Facilities'
accounts. (Compl. ¶¶ 191-193.) The HCP Plaintiffs seek an
injunction to adjust the accounts in accordance with the MA.
(Compl. ¶ 195.) Similarly, Count XVI sets forth allegations
suggesting that Sunrise received and retained funds in violation
of its fiduciary duties, including: (1) funds obtained through
undisclosed and improper charges, fees, and allocations; (2)
funds obtained from the unauthorized provision of ancillary
activities at the Facilities by third-party ancillary service
providers; and (3) funds obtained by withholding amounts due to
the Facilities under the MA. (Compl. ¶ 198.) The HCP
Plaintiffs seek an injunction requiring Sunrise and its
affiliates to hold these funds in a constructive trust for the
HCP Plaintiff's benefit. (Compl. ¶ 204.) A grant of the HCP
Plaintiffs' requests on these Counts depends on whether Sunrise

37

breached the MAs and OAs, which, as discussed above, it has not

because no reasonable trier of fact could find that Sunrise

violated the aforementioned provisions. Because the HCP

Plaintiffs cannot show that they would likely succeed on the

merits for the reasons discussed above, the Court grants summary

judgment in favor of Sunrise as to Counts II, XV and XVI.

### iv. Count I (Declaratory Judgment)

The Court grants summary judgment in favor of Sunrise

because declaratory relief is improper where Sunrise did not

breach the MAs and OAs, and was improperly terminated from the

Camarillo Facility, such that the HCP Plaintiffs cannot be

released from the MAs and obtain further access to the

Facilities' records beyond what Sunrise has provided. Under the

Declaratory Judgment Act, 28 U.S.C. § 2201(a), a federal court

"may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not

further relief is or could be sought." 28 U.S.C. § 2201(a).

Declaratory relief is awarded if the relief sought (1) will

serve a useful purpose in clarifying and settling the legal

relations in issue, and (2) will terminate and afford relief

from the uncertainty, insecurity and controversy giving rise to

the proceeding. *Dourous v. State Farm Fire & Cas. Co.*, 508 F.

Supp. 2d 479, 482 (E.D. Va. 2007) (internal citation omitted).

Here, the HCP Plaintiffs request a judicial declaration
that: (1) Sunrise breached the MA and OA through the commission
of various monetary and non-monetary defaults; (2) the HCP
Plaintiffs may terminate the MAs; (3) HRA properly terminated
Sunrise as manager of the Camarillo Facility under § 12.06 of
the Camarillo MA for failure to obtain proper Medicare
certification; and (4) that Sunrise grant the HCP Plaintiff's
independent auditors access to the Facilities' account book and
records.  (Compl. ¶¶ 130-133.)  The Court denies the HCP
Plaintiffs' first request because as discussed, no reasonable
trier of fact could find that Sunrise violated the MAs and OAs
alleged by the HCP Plaintiffs.  The Court also denies the HCP
Plaintiffs' second request for the same reasons.  Because the
Court finds that Sunrise did not breach the MAs or OAs, the HCP
Plaintiffs may not invoke its right to terminate the MAs or OAs.
The Court further denies the request that HRA be permitted to
terminate Sunrise from the Camarillo Facility because Medicare
certification is not a license to operate an assisted living
facility.  As discussed, nothing in the MAs requires Sunrise to
obtain or maintain Medicare certification at the Camarillo
Facility.  Finally, the Court denies the HCP Plaintiffs' request
that Sunrise grant the HCP Plaintiffs' independent auditors
access to the Facilities' account book and records.  Sunrise has
successfully introduced evidence that contradicts any dispute of

material fact that it violated the MAs and OAs.  Because the

Court finds that Sunrise did not breach the MAs and OAs,

declaratory relief is improper.  Therefore, the Court grants

summary judgment in favor of Sunrise as to Count II.

## B. Sunrise's Counterclaim

### i. Count I (Breach of Contract)

The Court grants summary judgment in favor of the HCP

Plaintiffs as to Count I because no reasonable trier of fact

could find that the HCP Plaintiffs' alleged violations of the

MAs and OAs caused actual damage to Sunrise.  At dispute is

whether the HCP Plaintiffs' alleged obstruction of Sunrise's

ability to effectively manage the Facilities caused financial

harm to Sunrise.  As stated in the MAs, "the budget as proposed,

shall be considered by [HRA] and, in consultation between [HRA]

and [Sunrise], the budget for the Facilit[ies] for the ensuing

fiscal year will be prepared by [Sunrise] with the final

contents of the budget to be determined mutually by [Sunrise]

and [HRA] . . . ."  (Mgmt. Agmt. § 7.01.)  Sunrise must also

prepare a Repairs and Equipment Estimate of the Facilities'

expenditures and submit it along with the Annual Operating

Budget.  (Mgmt. Agmt. § 11.02(d).)  Aside from these

requirements, Sunrise has "complete and full control and

discretion in the operation, direction, management and

supervision of the Facilit[ies] . . . ."  (Mgmt. Agmt. § 2.01.)
As party to the MAs, HRA "agrees to comply with all of the
applicable provisions of [the MA] and to perform all
obligation[s]" set forth therein.  (Mgmt. Agmt. § 10.03.)

Sunrise asserts that the HCP Plaintiffs engaged in various
bad faith conduct in an effort to force Sunrise to restructure
the Facilities' MAs.  Specifically, the HCP Plaintiffs refused
to approve budgets and engage in meaningful negotiation with
Sunrise regarding the budgets.  (Am. Countercl. and Third-Party
Compl. ¶ 36.)  According to Sunrise, the HCP Plaintiffs also
obstructed capital expenditures at the Facilities by refusing to
advance sufficient funds to Sunrise.  (Am. Countercl. and Third-
Party Compl. ¶¶ 41 & 43.)  Sunrise further insists that the HCP
Plaintiffs made bad faith demands by requesting: (1) information
regarding the Facilities' licensing;, (2) all reports filed by
the Facilities with any agency in connection with any legal
requirement; (3) marketing and financial data; and (4) proof
that the prices Sunrise paid for services are reasonable and
competitively priced.  (Am. Countercl. and Third-Party Compl. ¶
45.)

While Sunrise has sufficiently shown that no disputed
material fact exists concerning the HCP Plaintiffs' failure to
perform under the MAs, it has not shown that the alleged breach
caused actual damage.  Sunrise claims that its share of the

41

Facilities revenue was depressed due to the HCP Plaintiffs' bad faith conduct. (Am. Countercl. and Third-Party Compl. ¶¶ 43-44.) Specifically, Sunrise claims that it suffered a loss of $191,000 due to HCP's alleged failure to approve capital expenditures. (Def.'s Opp'n Pls.' Mot. Summ. J. 29.) Sunrise also points to a diminution in the value of its stock. These statements alone, however, do not show how Sunrise suffered actual damage when its corporate representative, Mr. Eugene Weil, indicated that Sunrise's parent company "suffered the harm." (Nickelsburg Decl. Ex. 93 at 96:20-99:5; Am. Counterclaim and Third-Party Comp. ¶¶ 43-44; Def.'s Opp'n Pls.' Mot. Summ. J. 27.) Sunrise provides no evidence to suggest that a trickle down effect caused financial damage to its ability to manage the Facilities. Rather, Sunrise recognizes that corporate entities are separate and distinct, suggesting that it does not bear the damage suffered by its parent company; and Sunrise offers no facts that would allow the Court to pierce the corporate veil to find the necessary damages. (Def.'s Opp'n Summ. J. 26-28. Because Sunrise fails to establish a genuine issue of material fact with respect to damages, it thereby fails to satisfy all elements for a breach of contract claim. As such, the Court grants summary judgment in favor of the HCP Plaintiffs on Count I of the Counterclaim.

## ii. Count III (Tortious Interference with Contractual Relations

The Court grants summary judgment in favor of the HCP
Plaintiffs because no reasonable trier of fact could find that
the HCP Plaintiffs intentionally interfered with HRA's
obligations to Sunrise under the MA.  The elements of tortious
interference with contractual relations include:  (1) a valid
contractual relationship or business expectancy; (2) knowledge
of the relationship or expectancy on the part of the interferor;
(3) intentional interference inducing or causing a breach or
termination of the relationship or expectancy; and (4) resultant
damage to the party whose relationship or expectancy has been
disrupted.  *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)
(citation omitted).

Sunrise alleges that the HCP Plaintiffs conspired with HRA
to cause HRA to breach its contractual obligations to Sunrise.
(Am. Countercl. and Third-Party Compl. ¶ 63.)  Sunrise argues
that the HCP Plaintiffs had a plan to threaten Sunrise with
terminating the MA if the latter refused to restructure the MAs.
(Def.'s Opp'n Pls.' Mot. Summ. J. 29-30; Keyes Decl. Exs. 9 &
11.)  However, it is unclear from the record how HCP
intentionally induced or caused a breach or termination of the
relationship between Sunrise and HRA.  (Keyes Decl. Ex. 100 at
80:7-81:15 & 94:5-96:21.)  Moreover, while Sunrise asserts that

43

its share of the Facilities revenue has been depressed, it is
unclear under what theory and how Sunrise, rather than its
parent company, is actually damaged. (Am. Countercl. and Third-
Party Compl. ¶¶ 43-44; Nickelsburg Decl. Ex. 93 at 96:4-99:5;
Def.'s Opp'n Pls.' Mot. Summ. J. 25-28.)  Consequently, the
Court grants summary judgment in favor of the HCP Plaintiffs.

### iii. Counts IV & V (Conspiracy to Harm Business and Reputation

        The Court grants summary judgment in favor of the HCP
Plaintiffs as to Sunrise's conspiracy claims because no
reasonable trier of fact could find the HCP Plaintiffs willfully
and maliciously injured Sunrise's business or reputation.  A
common law conspiracy consists of "two or more persons combined
to accomplish, by some concerted action, some criminal or
unlawful purpose or some lawful purpose by a criminal or
unlawful means." *Commercial Bus. Sys., Inc. v. Bellsouth
Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995).  The damage caused
by the acts committed in furtherance of the conspiracy is the
foundation of a civil claim of conspiracy. *Id* (citations
omitted).  Similarly, Virginia law provides that any person who
attempts to procure the participation of others in an attempt to
willfully and maliciously injure another in his reputation,
trade, business or profession can be liable for statutory
conspiracy. *See* VA. CODE ANN. § 18.2-499.  A plaintiff proceeding

under this statute must prove his case by clear and convincing evidence. *See* VA. CODE ANN. § 18.2-500. Instead of actual malice, the statute "merely requires[s] proof legal malice, *i.e.*, that . . . acted intentionally, purposely, and without lawful justification." *Commercial Bus. Sys., Inc.*, 453 S.E.2d at 267.

From the record, it is unclear how the HCP Plaintiffs willfully and maliciously injured Sunrise's business or reputation by attempting to get Sunrise to alter its contractual relationship with HCP before and after the CNL-HCP merger. It is also unclear how HCP joined forces with HRA to drive Sunrise out of business. The mere fact that HCP wishes to have Sunrise lease rather than manage the Facilities, without more, does not amount to unlawful intent, where Sunrise acknowledges that the parties engaged in discussions at length regarding possible restructuring of the MAs. (Am. Countercl. and Third-Party Compl. ¶ 15.) Sunrise concedes it agreed to the discussions and reached a tentative agreement with HCP, whereby HCP would buy out a limited number of the MAs and the structure of the remaining MAs would change. (Def.'s Mem. Supp. Summ. J. ¶ 5.) The parties' failure to come to an agreement is not clear and convincing evidence that HCP conspired with HRA to harm Sunrise. (Am. Countercl. and Third-Party Compl. ¶¶ 21 & 22.)

Additionally, Sunrise's contention that HCP audited

Sunrise's books and records in an attempt to pressure it into renegotiating the MAs is weakened by the fact that HCP's conduct was within its rights under the MAs. (Am. Countercl. and Third-Party Compl. ¶¶ 18 & 19.) As owner of numerous senior living facilities worth millions, it is reasonable that HCP consider changes to its contractual relationship with various parties, let alone Sunrise, so as to increase its revenues. HCP stands to benefit financially from Sunrise's successful management of the Facilities, which could only be strengthened by HCP's support and cooperation. Thus, Sunrise's conspiracy claims suffer from a defect similar to its other claims—absence of evidence showing Sunrise suffered damage—which in this instance concerns financial loss or harm to business reputation. (Am. Countercl. and Third-Party Compl. ¶¶ 43-44.) The Court, therefore, grants summary judgment in favor of the HCP Plaintiffs as to Counts IV and V.


## IV.   CONCLUSION

For these reasons, the Court grants summary judgment in favor of Sunrise as to Counts I – XVI of the HCP Plaintiffs' Complaint. As to Sunrise's Counterclaim, the Court grants summary judgment in favor of the HCP Plaintiffs as to Counts I, III – V.

The Clerk is directed to forward a copy of the Memorandum Opinion to counsel.

Entered this ___3___ day of August, 2010.

Alexandria, Virginia

/s/
Gerald Bruce Lee
United States District Judge